WALLACE, Judge.
 

 Rico Correa challenges the revocation of his community control based on his alleged noncompliance with Global Positioning System (GPS) monitoring rules and his resulting sentences. Because the State failed to prove that Mr. Correa willfully and substantially violated the conditions of community control that he was alleged to have violated, we reverse.
 

 I. THE FACTS AND PROCEDURAL HISTORY
 

 On February 25, 2008, Mr. Correa was adjudicated guilty of two felony offenses and sentenced to two years’ community control on each offense. The two-year periods of community control were designated to run concurrently.
 
 [1]
 
 Standard condition (13) of the terms of Mr. Correa’s community control provided as follows:
 

 If on community control you may, at the discretion of the Department of Corrections, be placed on Electronic Monitoring. However, for offenses committed on or after September 1, 2005, if you are placed on community control or probation, you shall be placed on electronic monitoring if you meet the conditions set forth in F.S. 948.30(3). If electronically monitored you shall wear the device designated by the Department of Corrections at all times and you shall comply with all Rules and Regulations of the Electronic Monitoring Program. You are financially responsible to the Department for any lost or damaged equipment. You will pay $30.00/month for RF monitoring and $50.00/month for GPS monitoring, unless otherwise set or waived by the Court.
 

 
 *740
 
 In addition, special condition (54) of Mr. Correa’s community control required him to wear a GPS monitoring device on his ankle.
 
 [2]
 

 Approximately five months after Mr. Correa was placed on community control, his Community Control Officer (CCO), Derek Blanton, filed an affidavit of violation of community control, alleging that Mr. Correa had violated special condition (54), which required electronic monitoring, by “fail[ing]/refus[ing] numerous times to abide by the rules of the GPS monitoring program, therefore failing to allow him to be supervised properly by the GPS monitoring program.” The affidavit also alleged a violation of standard condition (7) “by failing to comply with all lawful instructions given to him by the probation officer.” As grounds for this violation, the affidavit alleged that Mr. Correa “was instructed to abide by all GPS monitoring rules and the offender did fail to carry out this instruction by willfully failing/refusing to abide by the GPS monitoring rules.”
 

 A careful review of the affidavit of violation of community control reveals that the entire basis for the two violations stated was Mr. Correa’s alleged failure to abide by the GPS monitoring rules.
 
 [3]
 
 The CCO did not allege that Mr. Correa had violated any other condition of his community control. The affidavit was never amended or supplemented to allege any additional violations.
 

 In order to understand the facts and the analysis in this case, some understanding of how the electronic monitoring system works is essential. An ankle bracelet containing a tiny transmitter/receiver is attached to the person to be monitored. But the ankle bracelet is not the device that sends the location signal to the monitoring center. Instead, the ankle bracelet communicates with a small box, about the size of two cigarette packs placed side by side. This unit, referred to as the Miniature Tracking Device (the MTD), contains a GPS and a cell phone capable of receiving and sending text messages. When the subject is at home, the MTD is placed in a charging cradle or station located in a fixed position in the residence.
 
 [4]
 

 The MTD is monitored by a private company. If the subject strays outside the area where he or she is authorized to be, his or her location will be known, but there is no specific alarm associated with such an event. Normally, the subject would simply carry the MTD in his or her pocket, but if for some reason he or she should not have the unit on or about his or her person and should stray too far from the MTD, an alarm will be transmitted, referred to as a “bracelet-gone” alert. An alarm would also be transmitted if the subject cut off the ankle bracelet. Finally, the monitoring company can also determine if the MTD is in or out of its charging cradle.
 
 [5]
 

 
 *741
 
 The components used for GPS monitoring comprise a sophisticated electronic system. These systems are but one example of the ever-increasing complexity of the technological age in which we live. As with many electronic systems comprised of multiple components, GPS monitoring systems experience failures for a variety of reasons.
 
 [6]
 
 The failures in GPS monitoring systems frequently take the form of false alerts. False alerts may be caused by equipment malfunctions or unintentional user error. As one commentator notes:
 

 Two-piece GPS systems, which rely on radio frequencies to tether the GPS receiver to the anklet, are particularly vulnerable to alerts, even when there is no intention on the part of the offender to abscond. One study found that only 14 percent of all the GPS alerts received in the course of one year involved legitimate location violations.
 

 Robert S. Gable,
 
 Left to Their Own Devices: Should Manufacturers of Offender Monitoring Equipment be Liable for Design Defect?,
 
 2009 U. Ill. J.L. Tech. & Pol’y 333, 337-38 (2009). Malfunctions of monitoring equipment have also been noted in reported cases.
 
 See, e.g., United States v. Barros,
 
 340 Fed.Appx. 509, 511 n. 1 (10th Cir.2009) (noting reported problems with GPS transmitters);
 
 Cofer v. State,
 
 28 So.3d 927, 929 (Fla. 4th DCA 2010) (Hazouri, J., concurring) (stating that a former prison inmate on conditional release “was repeatedly given defective monitoring equipment, which malfunctioned on numerous occasions”);
 
 J.J.C. v. State,
 
 792 N.E.2d 85, 87 (Ind.Ct.App.2003) (reversing the revocation of a juvenile’s probation that included home detention with electronic monitoring based on curfew violations where the State was unable to establish that the monitoring equipment was reliable and the juvenile’s mother had reported what she perceived to be malfunctions of the monitor to a probation officer).
 

 At the revocation hearing, Officer Blan-ton testified that Mr. Correa had multiple problems with compliance. A “bracelet-gone” alert — indicating that Mr. Correa had strayed too far from his MTD
 
 [7]
 
 — was received on twelve separate occasions between May 25 and July 1, 2008, and a home curfew violation alert occurred on July 4, 2008. Much of the testimony centered on the July 4 incident.
 

 All of the “bracelet-gone” alerts involving Mr. Correa occurred during hours when he was supposed to be at his approved residence; however, there was no direct evidence that he was not at home on those occasions. Each time a “bracelet-gone” alert occurred, the monitoring company would call Mr. Correa at his home to ascertain his whereabouts. Mr. Correa would invariably answer the phone and respond that he had been outside. It was undisputed at the revocation hearing that Mr. Correa’s residence had a front porch. When the monitoring company asked Mr. Correa where the monitoring device was, he would always respond that it was in the charger. We find it significant that the monitoring company never reported that it was unable to reach Mr. Correa at home.
 

 Officer Bob Mayes, another CCO involved in the case, testified at the revocation hearing that the area within which the monitor allowed Mr. Correa to roam could
 
 *742
 
 actually be rather extensive. The MTD would not normally alert when Mr. Correa just stepped outside the house. If there was no obstruction between the MTD and the ankle bracelet, the subject could be as much as 100 feet away and the MTD would not alert. On the other hand, Mr. Mays explained that an alert could occur when the subject was as close as three feet away if there was some obstruction, e.g., a refrigerator, between the bracelet and the MTD.
 

 Mr. Correa testified that he had not initially received any instruction concerning the technical use of the MTD and its charging unit. He said that he was told to “[sjtay close to the box.” Mr. Correa claimed that no one told him about having to be within a specific distance from the MTD. Mr. Correa admitted that Officer Blanton told him that the best way to prevent “bracelet-gone” alerts while at home was to stay inside, but he testified that he was never directly ordered to stay inside the residence or that he could not go outside on the front porch. Mr. Correa asserted that on the occasions when he was called by the monitoring company because of a “bracelet-gone” alert, he was usually outside his house, generally on the front porch.
 

 Despite the absence of any evidence that Mr. Correa was absent when he was supposed to be at home, there was one occasion when it took about a half-hour to reach him. This incident occurred on July 4, 2008. The July 4 incident involved an alert indicating that the MTD had been removed from its charger when Mr. Cor-rea was supposed to be at home.
 

 Officer Blanton testified that on July 4, 2008, he personally observed Mr. Correa outside the house, where “he wasn’t supposed to be.” When Officer Blanton saw Mr. Correa on that occasion and asked him where his monitoring device was, Mr. Cor-rea readily admitted it was inside the house. Officer Blanton testified that this was a violation because he had instructed Mr. Correa multiple times to remain indoors during home curfew hours to avoid further “bracelet-gone” alerts.
 

 On the evening of July 4, 2008, Diane Lehman, a probation officer, was on call. At about 9:19 p.m., the monitoring company received an alert indicating a home curfew violation, i.e., that Mr. Correa’s MTD was not in its charger. The monitoring company notified Officer Lehman of the problem at 9:51 p.m. Officer Lehman called the monitoring center and asked them to send Mr. Correa a text message (to the MTD) to place the MTD in the charger. At 10:20 p.m., an hour after the initial alarm, Mr. Correa had not responded, so Officer Lehman called him on his home phone. When Mr. Correa came to the phone, Officer Lehman told him the reason for the call. Mr. Correa told her that he did not hear the MTD ringing because it was in “vibrate” mode. Mr. Correa then asked her to hold for a minute. When he came back, he told her that he checked the MTD and found it was not properly seated in the charger. At 10:31 p.m., the alarm had not yet cleared. Officer Lehman told the monitoring center to do a “points download.”
 
 [8]
 
 At 11 p.m. the alarm had still not cleared. Officer Lehman sent Mr. Correa a text message to call her. He did not do so. Three minutes later, at 11:03 p.m., she sent him another message telling him to take the MTD outside to see if it would clear the
 
 *743
 
 alarm. At 11:15 p.m. the alarm cleared.
 
 [9]
 

 At the conclusion of the hearing, the trial court orally found that Mr. Correa was in willful and substantial 'violation of standard condition (13) and special condition (54) of his community control but did not mention standard condition (7). However, the written order properly identifies the two charged violations: special condition (54) and standard condition (7).
 
 [10]
 
 At the hearing, the trial court did not explain the basis for its ruling, and the written order provides no additional clarification. Thus this court does not know the specific conduct of Mr. Correa that the trial court deemed sufficient to constitute a willful and substantial violation of the conditions of his community control. After revoking Mr. Correa’s community control, the trial court sentenced him to two lengthy prison terms.
 
 [11]
 
 One of the prison sentences is to be followed by a substantial period of probation. This appeal followed.
 

 II. DISCUSSION
 

 We turn now to an examination of the evidence supporting a violation of conditions (54) and (7). When seeking to revoke a defendant’s community control, the State must prove by the greater weight of the evidence that a willful and substantial violation occurred.
 
 Anthony v. State,
 
 854 So.2d 744, 747 (Fla. 2d DCA 2003). “The trial court has broad discretion to determine whether a willful and substantial violation occurred, and on appeal, the standard of review is whether the trial court abused its discretion.”
 
 Id.
 
 “That is, the appellate court must determine whether or not the trial court acted in an arbitrary, fanciful or unreasonable manner in determining that [the] violation was both willful and substantial.”
 
 State v. Carter,
 
 835 So.2d 259, 262 (Fla.2002).
 

 Before we discuss Mr. Correa’s alleged violations, we will briefly review several Florida cases that have addressed alleged violations of GPS monitoring rules. In a recent case, this court approved the trial court’s finding of a violation of GPS monitoring rules where the evidence showed that the subject intentionally removed the MTD “from his person occasionally while he was working” and repeatedly failed to keep the MTD properly charged.
 
 Soliz v. State,
 
 18 So.3d 1094, 1097 (Fla. 2d DCA 2009). In another recent case, it appeared that the subject, who was on conditional release, did not violate the conditions of his supervision when he had complied with his supervising officer’s instructions and “was repeatedly given defective monitoring equipment, which malfunctioned on numerous occasions.”
 
 Cofer,
 
 28 So.3d at 929 (Hazouri, J., concurring). In two other cases, evidence from the monitoring equipment established the subject’s noncompliance with curfew or other activity restrictions.
 
 See Anthony,
 
 854 So.2d at 746-48;
 
 Alarcon v. State,
 
 814 So.2d 1180, 1181 (Fla. 4th DCA 2002).
 
 [12]
 

 
 *744
 
 In this case, Mr. Correa was charged with violating special condition (54) of his community control, which is described entirely as, “GPS monitor while on CC.” He was also charged with violating standard condition (7) by failing to follow his CCO’s instructions, but only with regard to the “GPS monitoring rules.” The GPS monitoring rules contain several provisions. For example, the rules warn the wearer of the bracelet not to tamper with the equipment and to report equipment damage or malfunction “immediately.” The rules also contain instructions as to charging, positioning of the MTD in the charger when at home, and use and care of the MTD when the community eontrollee is traveling outside his residence. One of the electronic monitoring requirement rules is that the monitor “must not be moved from where your probation officer places it in your home, unless otherwise directed.” In this case, there was no evidence that Mr. Cor-rea’s CCO had ever actually been inside Mr. Correa’s residence. Thus the location of the monitor charging stand may have been chosen by Mr. Correa himself.
 

 Having carefully reviewed these rules and the transcript of the revocation hearing, we are at a loss to determine exactly which GPS monitoring rule it was that the trial court found Mr. Correa had violated. In the absence of a specific finding by the trial court, our best guess is rule (8), which requires that the community contro-lee “respond immediately to all messages sent to your tracking device.” In this case, the only time this rule could be said to have been violated was on July 4, 2008, between 9:19 and 11:15 p.m. However, when the duty officer investigated the alarm, she found Mr. Correa at home. His excuse for not hearing the MTD ring — that he inadvertently left it in vibrate mode — was unrefuted. We cannot conclude that this single, apparently accidental, incident constituted a willful and substantial violation of the terms of Mr. Correa’s community control. Unlike in
 
 Soliz,
 
 the State failed to establish that Mr. Correa’s conduct involved deliberate violations of the GPS monitoring rules.
 

 Concerning the fact that the MTD was out of its charger for more than an hour, this would only be a curfew violation if Mr. Correa was actually away from his home. But this was not the case. The monitoring company specifically told the duty officer that although it had received an alert, Mr. Correa “was showing in the home zone but that the [MTD] wasn’t in the charger.” In other words, Mr. Correa was verifiably at home.
 
 [13]
 

 Officer Blanton testified that he had personally observed Mr. Correa outside the home and that had he instructed Mr. Cor-rea to go inside to avoid further “bracelet-gone” alerts. In addition, Mr. Correa admitted he was outside on several of the occasions that the monitoring company reported “bracelet-gone” alerts. However, unlike in
 
 Anthony
 
 or
 
 Alarcon,
 
 there was no evidence that Mr. Correa was actually away from his residence or other approved activity when the alerts occurred.
 

 We note that Mr. Correa’s admissions to having been outside the structure of his residence on several occasions might arguably have qualified, depending on the actual circumstances, as evidence of violations of condition (12) of his community control, which required that he remain confined to his residence when not at work or engaged in an approved activity. However, Mr. Correa was not charged with violating condition (12); he was only charged with failing to comply with the monitoring rules. The question of whether a probationer or
 
 *745
 
 community controllee violates a home curfew restriction by being outside the residential structure but within the curtilage of his or her residence appears to be unsettled in Florida.
 
 [14]
 

 Cf. Jackson v. State,
 
 785 So.2d 524, 526 (Fla. 4th DCA 2000) (holding that under the specific facts of that case, a community controllee’s act of standing in the yard in the immediate area of her residence did not demonstrate a willful and substantial violation of the condition that she remain confined to her residence).
 

 Finally, we note that although condition (7) requires Mr. Correa to comply with his CCO’s instructions, the affidavit of violation only alleges as grounds for the violation of condition (7) that Mr. Correa failed to follow the GPS monitoring rules as instructed. Because there is no evidence that Mr. Correa failed to follow the GPS monitoring rules, he cannot be said to have disobeyed the instructions of his CCO in this regard. He may arguably have disobeyed the instructions of his CCO in some other respect, but no other grounds for the failure to comply with this condition were alleged.
 

 III. CONCLUSION
 

 The purpose of the electronic monitoring of probationers, community contro-lees, and parolees is not punitive.
 
 Taylor v. Remmers,
 
 2002 WL 554520 *4 (N.D.Ill. Apr.12, 2002);
 
 Hadley v. Montes,
 
 379 Ill. App.3d 405, 318 Ill.Dec. 472, 883 N.E.2d 703, 709-711 (2008). Instead, the electronic monitoring of these persons serves two more positive goals. First, electronic monitoring enables a limited number of supervising officers to supervise persons subject to home curfew or similar restrictions more easily, more efficiently, and at a lower cost. Second, electronic monitoring helps the subject to conform his or her conduct to society’s requirements by discouraging behaviors that are likely to lead to new law violations or other violations of supervision.
 
 See Hadley,
 
 318 Ill.Dec. 472, 883 N.E.2d at 709 (“[T]he purpose of electronic monitoring [is] not to punish [the offender] but to foster his return to society through a supervised transition from prison life.”). We lose sight of these salutary goals if we treat the GPS monitoring rules as a rigid regime in which every person subject to GPS monitoring must inevitably fall short of perfect compliance. And, lamentably, such a Draconian approach easily lends itself to selective enforcement, sending some to prison and sparing others in similar circumstances. Of course, intentional disregard of the GPS monitoring rules, tampering with the equipment, or actual violations of curfew or other activity restrictions will generally amount to willful and substantial violations of the conditions imposed. But where, as in Mr. Correa’s case, the apparent noncompliance with the rules results from equipment problems or the subject’s unintentional failure to operate the equipment properly, the noncompliance with the rules does not rise to the level of a willful and substantial violation of probation or community control. It fol
 
 *746
 
 lows that the trial court abused its discretion in ruling to the contrary and in revoking Mr. Correa’s community control.
 

 Based on the record before us, we conclude that the State failed to prove by a preponderance of the evidence that Mr. Correa willfully and intentionally violated any condition of the GPS monitoring rules. Accordingly, we reverse the revocation of Mr. Correa’s community control and vacate the sentences imposed on him.
 

 We note that Mr. Correa was originally placed on community control on February 25, 2008. Thus the two-year term of his community control has expired. Mr. Cor-rea was arrested on the warrant for the violation of his community control on July 14, 2008. He has been either in jail or in the state prison since that date. Thus, on remand, Mr. Correa is entitled to his immediate release on the offenses for which he was found guilty in the trial court.
 
 See Pupo-Diaz v. State,
 
 966 So.2d 1010, 1012 (Fla. 2d DCA 2007).
 

 Order of revocation reversed, sentences vacated, and case remanded for discharge.
 

 LaROSE and CRENSHAW, JJ, concur.
 

 [1]
 

 . The sentence of two years’ community control — which was agreed to by the State in a negotiated plea — represented a substantial downward departure from the minimum permissible sentence which could be imposed under the sentencing guidelines.
 

 [2]
 

 . The entire special condition reads, "GPS monitor while on CC.”
 

 [3]
 

 . The formal name for these rules is "Electronic Monitoring Equipment Assignment Rules.” On February 26, 2008, Mr. Correa signed a copy of the rules indicating that he had read them and had received the monitoring equipment.
 

 [4]
 

 . The rules promulgated by the Department of Corrections provide, in pertinent part, as follows: “You will charge the tracking device for a minimum of ten (10) hours a day and at all times while at home unless otherwise directed.”
 

 [5]
 

 .For additional information on the histoiy and functioning of electronic monitoring equipment, see Robert S. Gable,
 
 Left to Their Own Devices: Should Manufacturers of Offender Monitoring Equipment be Liable for Design Defect?,
 
 2009 U. Ill. J.L. Tech. & Pol’y 333, 335-39 (2009).
 

 [6]
 

 . For a discussion of the various problems that can occur with the GPS monitoring systems, see Gable, 2009 U. Ill. J.L. Tech. & Pol’y at 337-38.
 

 [7]
 

 . The parties refer to the device as an "MTD.” The electronic monitoring equipment rules refer to the device as a "PTD.” We assume the "P" refers to the fact that the device is portable and that the acronyms "PTD” and "MTD” refer to the same thing.
 

 [8]
 

 . What this is was not explained, but it appears to be a procedure meant to clear or reset the alarm condition.
 

 [9]
 

 . In the
 
 Cofer
 
 case, the supervising officer had also instructed Mr. Cofer to “walk the box outside” to clear a false alert.
 
 Cofer,
 
 28 So.3d at 929 (Hazouri, X, concurring).
 

 [10]
 

 . In cases where the oral pronouncement does not match the written order of revocation, this court will normally require the trial court to amend its written order to match the oral pronouncement.
 
 See Green v. State,
 
 19 So.3d 449, 450 (Fla. 2d DCA 2009). In this case, however, it is clear from the record and from the transcript of the proceedings that the trial court simply misspoke at the hearing. There was never any question that standard condition (7) was the condition under review.
 

 [11]
 

 . The prison sentences were designated to run concurrently.
 

 [12]
 

 . In
 
 Alarcon,
 
 the trial court sustained an objection to the admission into evidence of the electronic monitoring records on hearsay grounds. 814 So.2d at 1181.
 

 [13]
 

 . More correctly stated, the ankle bracelet was verifiably at Mr. Correa’s home. However, no evidence was presented that Mr. Cor-rea had removed or tampered with the bracelet, and as noted, when the duty officer called his home, he was there.
 

 [14]
 

 . According to one commentator, "[h]ome detention ... typically specifies an inclusion zone of 50 meters from the home-based receiving unit; however, the distance can be reduced for persons living in apartment buildings or other multi-family housing." Gable, 2009 U. Ill. J.L. Tech. & Pol’y at 338. The GPS monitoring rules in Mr. Correa's case do not reference a particular exclusion zone.
 

 Some activities outside the structure of the residence and within its curtilage may be unavoidable for a person subject to a home curfew restriction, e.g., hauling garbage cans and recycling bins to and from the curb, picking up the newspaper, washing the family car, and performing home and yard maintenance. Other outside activities may be nonessential but actually beneficial to the subject’s rehabilitation, e.g., gardening, playing a game of catch with a child, and enjoying a cookout with family and friends on a pleasant summer evening.